1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

[Additional counsel on signature page]

*Counsel for Plaintiffs & the Proposed Classes*

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

**RICARDO FRANCO and WILLIAM KIEFER, individually and on behalf of similarly situated persons,**

Plaintiffs,

v.

**FORD MOTOR COMPANY,**

Defendant.

Case No.: 5:22-cv-00907

**CLASS ACTION COMPLAINT FOR:**

1. **FRAUDULENT CONCEALMENT;**

2. **CAL. CIV. CODE §§ 1750, *et seq*. (CLRA);**

3. **CAL. BUS. PROF. CODE §§ 17200, *et seq*. (UCL);**

4. **BREACH OF IMPLIED WARRANTY;**

5. **VIOLATIONS OF THE SONG-BEVERLY ACT VIA IMPLIED WARRANTY;**

6. **BREACH OF EXPRESS WARRANTY;**

7. **VIOLATIONS OF THE SONG-BEVERLY ACT VIA EXPRESS WARRANTY.**

**JURY TRIAL DEMANDED**

## I. **INTRODUCTION**

1.   This action concerns a material safety and reliability defect in hundreds of thousands of Ford F-150s with EcoBoost engines for year models 2011-2016 (the "Class Vehicles"), all of which have defective exhaust manifolds that have a propensity to fail prematurely (the "Defect").

2.   The exhaust manifold is the first part of an exhaust system. It collects toxic gases that spew from the engine and funnels those gases down to the catalytic converter and ultimately the tailpipe.

3.   Given its role in re-routing the toxic gases from the engine, the exhaust manifold is critical to the safe and reliable operation of a vehicle. If the manifold fails, the car's performance and acceleration is impaired, and toxic fumes can be released into the vehicle's cabin, exposing the driver and passengers to dangerous carbon monoxide.

4.   Ford has long known about the exhaust manifold defect from a variety of sources as further detailed below.

5.   Despite having knowledge of the Defect, Ford has continued to sell and lease vehicles with the defective exhaust manifolds. At no point has Ford disclosed the exhaust manifold Defect to Plaintiffs, the Class, or the public.[1] Ford has instead concealed the Defect, denied its existence, and forced owners to pay costs for repair and replacement of the defective manifolds.

6.   Plaintiffs and the Class suffered economic injury at the time of purchase due to the existence of the Defect.

7.   Accordingly, Plaintiffs bring action to require Ford to conform its conduct to the law, honor its warranties, repair the defective vehicles, and reimburse and compensate all affected owners and lessees.

---

[1] Unless otherwise specified, "the Class" refers to all members of the proposed classes alleged herein.

## II. **PARTIES – JURISDICTION – VENUE**

### A. **Plaintiffs**

8.   Plaintiff Ricardo Franco is a resident of and domiciled in Rancho Cucamonga, California, within this judicial district and division. In 2013, Mr. Franco purchased a new Ford F-150 from Citrus Motors Ontario, Inc.—which is located within this district and division—at which time, though unbeknownst to him, he suffered economic injury due to the existence of the Defect. Accordingly, Plaintiff Franco is an in-state resident who brings this action to recover for economic injuries incurred within the State of California and within this judicial district and division.

9.   Plaintiff William Kiefer is a resident of and domiciled in Hesperia, California, within this judicial district and division. In 2016, Mr. Kiefer purchased a new Ford F-150 from Sunrise Ford—which is located within this district and division—at which time, though unbeknownst to him, he suffered economic injury due to the existence of the Defect. Accordingly, Plaintiff Kiefer is an in-state resident who brings this action to recover for economic injuries incurred within the State of California and within this judicial district and division.

### B. **Defendant**

10.   Defendant Ford Motor Company ("Ford") is incorporated under the laws of the State of Delaware and maintains its principal place of business in the State of Michigan. Ford may be served through its registered agent, CT Corporation System, 330 N Brand Blvd, Suite 700, Glendale CA 91203.

### C. **Subject Matter Jurisdiction**

11.   The United States District Court for the Central District of California has subject matter jurisdiction over this action under the Class Action Fairness Act because there is minimal diversity and the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2)(A). None of the causes of action stated here has been assigned or otherwise given to any other court or tribunal.

### D. Venue

12.  Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district. Defendant caused the Class Vehicles to be offered for sale and sold to the public, including Plaintiffs, in this district and division. Plaintiffs were exposed to Defendant's tortious conduct within this district and division. And each Plaintiff purchased a Class Vehicle in this district and division and incurred economic losses as a result.

13.  Venue also is proper pursuant to 28 U.S.C. § 1391(c)(2) because Defendant is subject to the Court's personal jurisdiction with respect to this action.

### E. Personal Jurisdiction

14.  Ford is subject to personal jurisdiction because it has purposefully availed itself of the privilege of doing business within the state, including within this district and division; it has had continuous and systematic general business contacts within the state, including within this district and division; and it can be said to have reasonably anticipated being haled into court in this forum.

15.  Ford committed the tortious acts at issue in this case within California and caused injury to Plaintiffs, and to other Class members, in this judicial district and division. This action thus arises out of and relates to conduct within this forum.

16.  Ford is and has since 1920 been registered to conduct business in California. Its registered agent is located within this judicial district. Ford does and long has done substantial business throughout California.

17.  Ford submitted itself to jurisdiction through the pervasive marketing, selling and servicing of Class Vehicles within California; through the encouragement of Class Vehicle purchases within California; through its purposeful cultivation of profitable relationships with customers, dealerships, service facilities, and other individuals and entities throughout California; and through its maintenance of offices and operations in California.

18. Ford receives substantial compensation and profits from the sale of Class Vehicles in California and within this judicial district and division.

19. Ford maintains corporate offices in California.

    a. In its submissions to the California Secretary of State, Ford represents that it maintains a California office in Palo Alto. Ford opened its first office in Silicon Valley in 2012 and, in 2015, built the Ford's Research and Innovation Center Palo Alto.

    b. Since 1998, Ford has had an office in Irvine that served as the headquarters for its Lincoln-Mercury brand and its premier brands.

    c. Ford also has maintained an office in San Diego since at least 2000, when it became the headquarters for Ford's environmental brand of vehicles.

    d. Ford's website advertises job openings at its Palo Alto, Irvine, and San Diego offices.

20. Ford also maintains authorized dealerships in California, as seen on the dealer locator map below:[2]



---

[2] https://www.socalforddealers.com/dealer-info/locate.html

21. According to Ford's Dealer Directory, there are 149 authorized Ford dealerships in California. Ten dealers are located within a 20-mile radius of the U.S. District Court in Riverside, including the dealerships from whom each Plaintiff purchased a Class Vehicle.[3]

22. Indeed, the largest volume Ford dealership in the world "for 29 years in a row" is located within this judicial district.[4]

23. In short, Ford has systematically served a market in California for the Class Vehicles—the defective vehicles that caused economic injury to Plaintiffs and the Class—such that there is a strong relationship among Ford, this forum, and the litigation.

## III. ADDITIONAL FACT ALLEGATIONS

24. The Class Vehicles are substantially similar in all relevant respects; namely, all the same make and model; all are equipped with EcoBoost; all the Class Vehicle exhaust manifolds bear the same part number; and all suffer from the Defect, i.e., a defective exhaust manifold that has a propensity to fail prematurely.[5]

25. The Class Vehicles include 2011-2016 Ford F-150s with EcoBoost engines.

26. As noted in the introduction, the exhaust manifold is the first component in the vehicle's exhaust system. It collects hot exhaust gases emitted by the engine cylinders during combustion and funnels them through a pipe to the catalytic converter, which removes some of the toxins and pollutants before the gases are expelled from the vehicle through the exhaust system out of the tailpipe.

---

[3] https://www.ford.com/dealerships/#/q/92501/radius/20

[4] https://www.galpinford.com/

[5] "EcoBoost engines combine three technologies—turbocharging, direct fuel injection and twin independent variable camshaft timing (Ti-VCT)—for power and efficiency." (https://www.ford.com/powertrains/ecoboost/).

27.   The exhaust manifold, typically made from cast iron or sheet metal, is most commonly attached to the cylinder head of an internal combustion engine using threaded studs, also sometimes referred to by laypersons as bolts, and by Ford as attachments.

28.   Below is a diagram of a typical, generic exhaust system:



29.   The exhaust manifold collects exhaust gases exiting the engine cylinders following combustion, making it one of the highest temperature areas underhood. The high temperature exhaust gases also contain the highest levels of pollutants as they exit the engine cylinders, including carbon monoxide. Thus, the exhaust manifold must be suitably designed to withstand the thermal expansion that occurs from extreme temperature fluctuations while the engine is operating versus when it is off, and to resist corrosion without warping or breaking.

30.   If the exhaust manifold warps or breaks, exhaust gases vent into the engine compartment rather than venting through the exhaust system.

31.   Engine exhaust gases released from an exhaust manifold leak in the engine compartment can seep into the vehicle fresh air inlet, which is located under the hood on the firewall or windshield cowl. The inlet supplies air to the vehicle heating, ventilation, and air conditioning ("HVAC") system, where it is directed through the

heating/cooling system and distributed into the interior of the vehicle through the air vents, exposing occupants to dangerous toxins.

32.   Exhaust manifold failures severely impact vehicle performance and safety and can result in:

      a.   carbon monoxide and other gases leaking into the occupant cabin, placing occupants at risk of inhaling toxic fumes;

      b.   unpleasant exhaust odor in the vehicle;

      c.   diminished acceleration power;

      d.   reduced towing capacity and slower acceleration when carrying heavier payloads;

      e.   lower fuel economy and engine efficiency;

      f.   greater emissions into the air; and

      g.   costs of repair/replacement.

**A.   The defective exhaust manifolds are prone to warp and break.**

33.   The Class Vehicles are equipped with Ford's 3.5L V6 EcoBoost engine—a twin turbo. Each turbo consists of two small turbines, one driven by exhaust gas exiting the engine through the exhaust manifold and one that sucks air in, compresses it, and forces the air into the combustion chambers in the engine. Including two turbos in a tightly packaged engine compartment increases temperatures and cooling demands.

34.   There are two exhaust manifolds—one on each side of the V6 engine— installed on each cylinder head, all of which have the same or substantially similar manifolds that suffer from the same Defect. The bottom of the manifold in this picture is the flat part that connects to the cylinder head, while the top left of the image is where the exhaust is directed to the turbo and exhaust downpipe.

35.   The image below shows a top-down view of the right-hand side exhaust manifold for a 2011-2016 F-150. The bottom of the manifold in this picture is the flat

part that connects to the cylinder head, while the top left of the image is where the exhaust is directed to the turbo and exhaust downpipe:



36.    The image below shows the flat side of the exhaust manifold that mounts to the engine cylinder head using eight threaded studs to mount and secure the component. (The hole circled below is used for the pipe connector, not for mounting to the engine cylinder head.)



37.    Although the manifold on the Class Vehicles contains only eight holes for securing it to the cylinder head, each engine cylinder head contains 11 threaded holes. This is evidenced by Ford service documents depicting the cylinder head of a 2015 F-150 with the 3.5L EcoBoost engine. In the image below, the white holes (circled in yellow) are the additional threaded holes that are manufactured into the cylinder

head, while the purple studs (demarcated with an "x8" arrow) show where the studs are placed to secure the exhaust manifold:[6]



38.   This image, taken from the same Ford service document, demonstrates how the exhaust manifold lines up to the cylinder head and attaching studs:



39.   Ford's failure to design with an adequate number of attachment locations to match the number of threaded holes in the engine cylinder heads contributes to warping and cracking. This is particularly notable in the areas of the manifold that contain lesser material gauge and fewer studs. For instance, there is only one stud situated at the location where the exhaust gases from all three cylinders are funneled before entering the turbo and exhaust down pipes, leaving it especially vulnerable to warping when exposed to the extremely high temperatures (in yellow):



---

[6] 2015 Ford Truck F 150 2WD V6 3.5L Turbo, Removal and Replacement Service Instructions, Exhaust Manifold LH.

40. The exhaust manifolds in the Class Vehicles also are made from an inadequate grade and/or gauge of cast iron.

41. Because of the enormous temperature fluctuations that result from the on/off cycles of the engine, exhaust manifolds and the attaching studs that are threaded into the cylinder head must be designed with materials that can suitably manage the thermal expansion and corrosion that results. When the exhaust manifold warps, the force can cause the attaching studs to break.

42. Ford owner forums have documented the 3.5L V6 EcoBoost engine manifolds warping, cracking, and/or breaking either the studs or the thin metal gasket that is layered between the exhaust manifold and the cylinder head. For instance, an owner of a Ford Transit (which is equipped with the same manifold) posted this entry showing numerous broken studs that required a torch to remove them from the cylinder head:[7]



---

[7] Ford Transit USA Forum, Warped Exhaust Manifold/Broken Exhaust Stud – DIY, Nov. 25, 2019 (https://www.fordtransitusaforum.com/threads/warped-exhaust-manifold-broken-exhaust-stud-diy-how-to.78354/).

43. The same owner also posted photos of the warped exhaust manifold once he had finally removed it, which can be seen when the mounting side of the manifold is placed on a flat surface:



44. A YouTube video posted by a master certified technician, titled "F-150 3.5 EcoBoost Exhaust Manifold Repair," is one of several such videos released by technicians demonstrating how to replace a warped or broken exhaust manifold. The video shows the black soot left on the cylinder head by carbon deposits as exhaust gas leaked out of a warped exhaust manifold:[8]



---

[8] F-150 Ecoboost 3.5 Exhaust Manifold/Stud Replacement (Tips and Tricks), Sept. 17, 2018 (https://www.youtube.com/watch?v=3r9-UT_3kyY).

45.   Another F-150 owner made a video noting that while the mounting studs on his engine cylinder heads did not break, the gasket cracked and showed signs of carbon deposits:[9]



46.   Exhaust manifold repairs are time-consuming, and costly, because manifolds are difficult to access in the engine compartment and the fastening studs often break while being removed. In some instances, engine removal is required to access all of the studs and components.

**B.   Ford has long been aware the exhaust manifolds are defective.**

47.   Since 2013, Ford and the National Highway Traffic Safety Administration ("NHTSA") have received numerous complaints from owners of Class Vehicles that exhaust odor was entering the vehicle cabin, with at least 100 of those specifically citing the need for an exhaust manifold replacement.

48.   In response to the complaints, Ford has since 2014 issued a series of Technical Service Bulletins ("TSBs") or Special Service Messages ("SSMs"), which

---

[9] F-150 3.5 Ecoboost Exhaust Leak, Apr. 2, 2021 (https://www.youtube.com/watch?v= XPp2DmFZkLk).

only Ford technicians receive, related to complaints of exhaust odors in the cabins of the Class Vehicles and others with identical or substantially similar manifolds that share the Defect.[10]

49.   Most of the Ford TSBs specify that customers may complain that the vehicle smells like sulfur. Although the smell of sulfur is an indicator of a leak that is occurring before the exhaust proceeds through the catalytic converter, which is designed to remove sulfide from the gas before it reaches the rear exhaust components, Ford has largely instructed technicians to focus on the rear exhaust system by inspecting and replacing the seals surrounding the rear liftgate, the rear air extractor under the bumper, and the rear undercarriage, as well as replacing the rear exhaust tip so that it aims downward rather than outward.

50.   The TSBs for vehicles with substantially similar manifolds also suggest that technicians reprogram the HVAC software to close the fresh air intake during periods of hard acceleration, so that the only air in the cabin is recirculated rather than being pulled in from under the hood. This too indicates that Ford is aware the exhaust fumes could be entering the cabin through the fresh air inlets under the hood near the exhaust manifold.

51.   Thus, rather than attempting to correct the underlying Defect and prevent the exhaust leak, Ford's repairs only attempt to prevent the leaking fumes from entering the cabin. While these TSBs did not apply to the Class Vehicles, technicians who received the same complaints of exhaust odor and carbon monoxide exposure in the Class Vehicles would have been aware of the prescribed repairs in the vehicles with substantially similar exhaust manifolds and focused on similar repairs.

---

[10] *See e.g.,* Ford TSB 14-0130, A/C Exhaust Odor in Cabin with A/C On, 2011-2015 Explorer; TSB 14-0201, Exhaust-Sulfur Odor After Hard Acceleration, 2011-2014 Edge and 2011-2015 Lincoln MKX; Ford TSB 16-0166, Exhaust Odor in Vehicle, 2011-2015 Explorer.

52.   Ford also has issued two Customer Satisfaction Campaigns during a years-long, ongoing investigation by NHTSA into carbon monoxide leaks in Ford vehicles. Ford campaign 17B25—covering the 2013-2017 Explorer Police Interceptor Vehicles—acknowledges that carbon monoxide may enter Explorer vehicles through holes drilled in the rear liftgate and the rear undercarriage for aftermarket police equipment and instructs that those holes be sealed. Because so many Police Interceptor vehicles required exhaust manifold replacement, the campaign does include an instruction to search for engine codes that relate to the catalytic converter not functioning efficiently, and to replace the exhaust manifold if those codes are present. Ford failed to address other vehicles with the same engine that are also experiencing exhaust manifold issues.

53.   In a separate Ford Customer Satisfaction Campaign, 17N03, covering 2011-2017 Explorer vehicles, Ford represents that the vehicles are safe because any level of carbon monoxide that enters the vehicle does not "exceed what people are exposed to every day."[11] Nonetheless, for "peace of mind," Ford offered to perform the rear-of-vehicle inspection and sealing, as well as the HVAC reprograming if requested. Ford did not mention the exhaust manifolds in dealer communications.

54.   Ford also has issued two Special Service Messages to dealer service technicians related to exhaust leaks caused by exhaust manifolds in certain (non-Class, but substantially similar) makes/models that specify the availability of a redesigned manifold.

55.   In October 2017, Ford released SSM 46801, which stated that "Some 2011-2014 SuperDuty vehicles equipped with 6.7L Diesel engine may experience an exhaust leak due to broken exhaust manifold studs. New parts have been released to service this condition." The new parts included updated exhaust manifolds, studs, and heat shields.

---

[11] Ford, Customer Satisfaction Program 17N03 - Supplement #1, Oct. 26, 2017, at 18.

56. More significantly, in September 2021, Ford appears to have released another Special Service Message, again only to its dealer technicians, stating that the Ford Transit vehicles that, like the Class Vehicles, are equipped with the 3.5L V6 EcoBoost engines, were "manufactured with cast iron exhaust manifolds that use 8 studs to attach to the cylinder head. A new service part is available for this application that is manufactured of stainless steel and uses 9 studs."[12]

57. By alerting its technicians that it has designed replacement exhaust manifolds for one model—a model that uses the same exhaust manifold (same part number) as that in the Class Vehicles—using a different material and design that incorporates an additional attachment point, Ford implicitly acknowledges the insufficiently robust design of the original version.

58. The SSM is not a recall or customer satisfaction campaign. It only advises technicians that a new part is available for purchase. It does not notify customers that a more robust part is available, suggest replacement of existing parts, or offer compensation to customers who require the new part. This SSM is not publicly available and was found only after extensive targeted research, which revealed that the content was cited on a Ford owner forum (cited above).

59. The SSM language provided the part numbers for the new replacement exhaust manifolds released by Ford to supersede the original designs. BL3Z-9430-D is the part number associated with the new redesigned right-hand side exhaust manifold and BL3Z-9431-D is the left-hand side exhaust manifold. Both are designed for use in the Class Vehicles.

60. The SSM did not specifically mention the 2011-2016 Ford F-150 vehicles despite the fact that these vehicles contain the same exhaust manifolds as the Transit model the SSM applies to. Thus, when owners of the Class Vehicles seek repair for

---

[12] https://www.fordtransitusaforum.com/threads/revised-ford-exhaust-manifolds-for-3-5-eco-boost-engines-2015-2021.86742/

slow acceleration, exhaust odors, and potential carbon monoxide exposure, the technician may not recognize that the exhaust manifold could be to blame, having not been alerted that the exhaust manifold currently in the vehicle is a defective manifold for which there is a sturdier replacement.

61. The TSBs, NHTSA investigation, SSMs related to the exhaust manifolds, and redesign of certain models' exhaust manifolds show that Ford is well aware that defective exhaust manifolds are allowing exhaust odors and toxins to enter the vehicle cabin and affecting the performance of the vehicles.

62. The redesign demonstrates that Ford is aware that the exhaust manifolds in the Class Vehicles are predisposed to failure; but it chose not to alert consumers to this fact.

63. Another SSM shows that even technicians are unsure why the substantially similar and defective exhaust manifolds in other models are designed with only eight studs when there are 11 stud holes drilled into the cylinder heads of the 3.5L V6 EcoBoost engines. In July 2017, Ford issued SSM 45880, which states that "Some 2013-2017 Explorer, Taurus, MKS, customers/technicians may perceive that the vehicle is missing one or more exhaust manifold studs. The cylinder heads are used on various vehicles and not all the bolting locations are utilized on every application." This suggests Ford was receiving enough inquiries and/or warranty claims from dealer technicians and customers who believed the manifold designs were missing the complete number of attachments.

**C. Aftermarket companies have sought to address the Defect that Ford concealed.**

64. Aftermarket companies have devised replacement exhaust manifolds to address the defective design of the Ford exhaust manifolds installed on Class Vehicles.

65. For example, BD Diesel—a company that manufactures and distributes replacement components for gas and diesel vehicles—states on its website:

The 2011-2016 Ford 3.5L has an inherent design flaw where not all of the OE [original equipment] stud locations are utilized by the OE manufacturer which leads to warped exhaust manifolds, broken exhaust studs and blown manifold gaskets. The cylinder head on Fords 3.5L Gas EcoBoost has threaded holes for 11 exhaust studs to be used, however the OE manifold only utilizes 8 of those stud locations. BD has designed a manifold that not only utilizes all 11 stud locations, but also improves exhaust flow and has improved durability, the way it should have come from the factory. BD's Ford 3.5L exhaust manifolds are made from thicker-walled high silicone ductile iron designed to resist thermal warping. These manifolds have been port matched to the cylinder head to optimize efficiency and promote quicker turbo spool up.[13]

66.   BD Diesel includes a diagram specifying the weak point on the Ford exhaust manifolds made for the Class Vehicles and depicting its design, which includes 11 mounting points intended to use all 11 of the available threaded attachment locations found on each 3.5L V6 EcoBoost cylinder head:



---

[13] BD Diesel, Exhaust Manifolds Ford/Lincoln 3.5L EcoBoost (https://us.bddiesel. com/ products/exhaust-manifolds-ford-f-150-3-5l-ecoboost-2011-2016?variant= 40928806961335).

67. Ford itself has developed a replacement manifold for the Class Vehicles that addresses the Defect, but it has not alerted consumers about the replacement and will not pay the costs of the replacement when the defective manifold fails.

**D.  Ford's misconduct injured Plaintiffs and the Class.**

68. Plaintiff Ricardo Franco purchased a new Ford F-150 from Citrus Motors Ontario, Inc. in 2013. Although unbeknownst to him at the time, he suffered economic injury due to the existence of the Defect in the Class Vehicle he purchased.

69. Plaintiff William Kiefer purchased a new Ford F-150 from Sunrise Ford in 2016. Although unbeknownst to him at the time, he suffered economic injury due to the existence of the Defect in the Class Vehicle he purchased.

70. As ordinary reasonable consumers, Plaintiffs reasonably believed when purchasing their Class Vehicles that they were non-defective, necessarily including non-defective exhaust systems, including the exhaust manifolds.

71. This belief is consistent with and was fostered by Ford's representations, such as those that the F-150 "provide[s] best-in-class towing and payload" that "takes it all with definitive strength and capability" and has been "attracting devoted fans for decades;"[14] and Ford's claims that, "The F-150 is purpose-built from the ground up – designed to be tough and productive. This is what happens when you merge premium-grade muscle with finely tuned intelligence and design. A beast with brains."[15]

72. A vehicle must have a properly designed and non-defective exhaust manifold in order to reliably and safely be driven.

73. Exhaust manifolds are supposed to—and ordinary reasonable consumers like the Plaintiffs expect them to—last for the duration of the vehicle's reasonably intended lifespan of up to 20 years.

---

[14] Ford, Explore 2022 Ford F-150, https://www.ford.com/trucks/f150/

[15] *Id.*

74.   The defective exhaust manifolds in the Class Vehicles are improperly designed and manufactured, as alleged above, and as a result can and often do fail well before the vehicles' intended life.

75.   Exhaust manifold failures compromise the performance of a vehicle, pose safety risks and other inconveniences as described above, and otherwise impair the utility and value of the vehicle.

76.   Consequently, if ordinary reasonable consumers knew of the Defect, they naturally would consider it an important and material fact in deciding whether to purchase or lease a Class Vehicle and/or how much to pay for it.

77.   As a long-time automotive manufacturer, by conducting numerous customer surveys, and by fielding hundreds of thousands or millions of complaints and warranty claims from consumers, Ford was aware that ordinary reasonable consumers generally expect defect-free automobiles when they make a substantial investment to purchase or lease; and to the extent consumers are aware that exhaust manifolds exist, they would expect them to be designed and manufactured without a propensity to fail prematurely. Indeed, Ford's advertising slogan, "Built Ford Tough" capitalizes on such expectations and is intended to leave consumers with the impression that Ford vehicles, including the component parts equipped in those vehicles, meet or exceed reasonable durability expectations.

78.   Ford could and should have designed the Class Vehicles to be free of the Defect.

79.   Having not done so, Ford could and should have informed Plaintiffs and the Class of the Defect rather than concealing it. Such information could have been provided through advertising and marketing campaigns; on-vehicle labeling, stickers, and placards; owner manuals; brochures; pamphlets; dealership personnel and agents; the internet and social media outreach; and through full and complete disclosure by way of recalls.

1    80.  Plaintiffs and the Class could have reasonably been exposed to such

2    information before purchasing their Class Vehicles through their interactions with

3    Ford's dealership personnel and agents; all the various marketing and advertising

4    Ford undertakes (including through television, internet, social media, sporting events,

5    and other media); by looking at their vehicles, upon which Ford could have affixed a

6    warning about the Defect which Plaintiffs would have necessarily seen by looking

7    and sitting in the vehicle itself; or through the mail or email, as Ford could sent out—

8    and indeed, regularly does send out—for the many recalls Ford routinely issues each

9    year.

10    81.  Despite having extensive knowledge of the Defect as detailed above—

11    knowledge far superior to that of Plaintiffs and the Class—Ford remained silent about

12    the Defect. As a result, the public—including prospective purchasers and lessors like

13    Plaintiffs and the Class—were unaware of the Exhaust Manifold Defect.

14    82.  Ford intended to mislead, and in fact misled, ordinary reasonable

15    consumers—including Plaintiffs and the Class—through its omissions and active

16    concealment of the Defect. Ford did so with the intent to generate and increase sales

17    of the Class Vehicles, thereby increasing its share of the automobile market and avoid

18    the expense of replacing the defective exhaust manifolds with the more robust

19    exhaust manifolds.

20    83.  The Class Vehicles have a diminished value compared to the price they

21    commanded when purchased or leased by Plaintiffs and the Class because disclosure

22    of the Defect would influence the purchasing and leasing decisions of ordinary

23    reasonable consumers, including their valuation and willingness to pay for the Class

24    Vehicles.

25    84.  Ford's misconduct also created and sustained increased market demand for

26    the Class Vehicles and increased Ford's market share relative to what consumer

27    demand and Ford's market share would have been had it not concealed the Defect.

28

85.   Plaintiffs and the Class lost money as a result because they did not receive what they reasonably believe they were paying for due to Ford's misrepresentations, omissions and active concealment of the Defect, while Ford realized a commensurate unearned gain because it did not deliver to Plaintiffs and the Class what they reasonably expected to receive in exchange for the money they paid.

86.   As a result of Ford's misconduct, Plaintiffs and the Class suffered economic injury at the time of purchasing or leasing their Class Vehicles. Specifically, either they purchased or leased vehicles that they otherwise would not have, or they paid more to own or lease their vehicles than they would have paid had the Defect been timely disclosed.

87.   Because the existence of the Defect in the Class Vehicles would have been patently material to any reasonable consumer, Plaintiffs and the Class would not have purchased or leased the Class Vehicles and/or would not have paid as much for them were the Defect not concealed.

88.   Ford's concealment caused Plaintiffs and the Class to pay more for the Class Vehicles than they otherwise would have, or to purchase or lease the Class Vehicles when they otherwise would have chosen not to. Stated differently, absent Ford's misconduct, Plaintiffs and the Class would only have been willing to pay less for the Class Vehicles, if they were willing to purchase or lease them at all.

89.   By concealing the Defect, Ford distorted and misrepresented the true value of every Class Vehicle such that every Plaintiff and Class member received a vehicle of different and substantially lesser value—one with a higher effective cost—than they reasonably believed they were receiving. Stated differently, Plaintiffs and the Class surrendered more and acquired less in their transactions than they would have if Ford had disclosed the Defect. Accordingly, Plaintiffs and the Class did not realize the benefit of the bargain in purchasing and leasing the Class Vehicles, and their expectations as ordinary reasonable consumers were not met.

90.   In effect, Plaintiffs and the Class paid substantially more than the market value represented by the price bargained for. Plaintiffs and the Class bargained on a particular market value for their respective Class Vehicles. But, because Ford's misconduct resulted in Plaintiffs receiving less than they bargained for, Plaintiffs and the Class effectively paid a higher price than that reflected in the market price.

91.   Through the use of misleading representations and omissions, including concealment of the Defect, Ford commanded a price for every Class Vehicle that exceeded what Plaintiffs and the Class would have paid had they been fully informed. Accordingly, every Class Vehicles is worth less than Plaintiffs and the Class paid to purchase or lease it.

92.   Plaintiffs and the Class also have suffered economic loss because the Defect significantly diminishes the value of the Class Vehicles.

93.   The cost of every Class Vehicle would have been lower absent Ford's concealment of the Defect and its related misconduct and Plaintiffs and the Class detrimentally altered their positions and suffered damages in an amount no less than the difference in value between what Plaintiffs and the Class reasonably believed they were paying for and the value of the Class Vehicle they actually received.

## TOLLING OF THE STATUTE OF LIMITATIONS

**A.    The statute of limitations did not begin to run because Plaintiffs did not discover and could not discover their claims.**

94.   Plaintiffs and the Class had no knowledge of Ford's misconduct, including the omissions and concealment alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein.

95.   Plaintiffs and the Class did not discover, and could not discover through the exercise of reasonable diligence, the fact that Ford had manufactured and/or sold the Class Vehicles with the concealed Defect. The limited, though probative, disclosures and revelations alleged in this Complaint required extensive investigation by counsel who suspected, and then became fully aware of, the Defect. Ordinary consumers do

not have detailed knowledge of vehicle systems and components, although they are justified in expecting their vehicles to be free of substantial defects like the Defect at issue in this action.

96.   Ford maintains exclusive control over its proprietary design materials and other technical information that would have revealed the existence and nature of the Defect and the ways in which it manifests when operating a Class Vehicle. Plaintiffs and the Class had no access to those materials or to any substitute that ordinary diligence would have revealed and, as a result, they could not reasonably have been expected to discover the Defect.

97.   Plaintiffs and the Class are ordinary consumers. No information in the public domain at the time of their purchases or leases sufficed to reveal Ford's misconduct, including its omissions and concealment of the Defect, or the Defect itself.

98.   Accordingly, the statute of limitations did not begin to run because Plaintiffs and the Class did not discover and could not discover their claims, or, in the alternative, because fraudulent concealment tolled the statute of limitations.

99.   Ford concealed the Defect for several years and has continued to do so up through the date this action was filed. It did and does so to create the false impression in the minds of Plaintiffs and the Class that the Class Vehicles were merchantable and that their component parts, including the exhaust manifolds, were able to perform their intended function safely and reliably.

100.   Plaintiffs and the Class were justified in not bringing the claims earlier based on Ford's failure to inform Plaintiffs and the Class of the existence, nature, extent, and scope of the Defect or its manifestations in Class Vehicles.

101.   For the foregoing reasons, the claims asserted in this action accrued much later than the time Plaintiffs and the Class purchased and leased their Class Vehicles, and this action is timely.

**B.    Fraudulent concealment tolled the statute of limitations.**

102.   In the alternative, and based upon the same facts alleged in Subsection A above, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted here.

103.   Plaintiffs and members of the Class were unaware of the Defect and Ford's misconduct when they purchased or leased their Class Vehicles.

104.   Ford's affirmative acts and omissions alleged herein were wrongfully concealed and carried out in a manner that precluded detection of both the acts and omissions themselves, and the existence, nature, extent, and scope of the Defect and its manifestations in Class Vehicles.

105.   By its very nature, Ford's misconduct was inherently self-concealing. Vehicle systems and components are subject to regulations and other laws governing their safety and merchantability.

106.   Plaintiffs and members of the Class reasonably expected the Class Vehicles, including their systems and components, to meet or exceeded such standards.

107.   Accordingly, a reasonable person under the circumstances would have no cause to investigate the legitimacy of Ford's conduct before or after purchasing or leasing a Class Vehicle and would have faced extreme difficulty in discerning the Defect that they had no reason to suspect in the first place.

108.   Because the misconduct was both self-concealing and affirmatively concealed by Ford, Plaintiffs and members of the Class had no knowledge of the misconduct, or of any facts or information that would have caused a reasonably diligent person to investigate whether misconduct existed until counsel revealed the Defect to Plaintiffs based upon extensive and also recent investigation.

109.   For these reasons, the statute of limitations as to Plaintiffs' and the Class's claims did not begin to run and has been tolled with respect to the claims that Plaintiffs allege in this Complaint and any others that might relate to it.

110. Further, the statute of limitations was tolled as a result of Ford's purposeful nondisclosure and other misconduct under the fraudulent concealment doctrine.

## V.     CLASS ACTION ALLEGATIONS

111. Pursuant to FRCP 23(b)(2) and 23(b)(3), Plaintiffs seek to certify a **National Class** comprised of:

> All persons in the United States who (a) purchased and still own, and/or (b) lease or leased, a Class Vehicle.

112. In addition, Plaintiffs seek to certify a **California Subclass** comprised of:

> All persons in the State of California who (a) purchased and still own, and/or (b) lease or leased, a Class Vehicle.

113. Unless otherwise stated, the term "Class" refers jointly and severally to the proposed National Class and to the proposed California Subclass.

114. Excluded from the Class are each Defendant and its board members, executive-level officers, attorneys, and immediate family members of any such persons; the Court, the Court's immediate family, and the Court staff; and any person who asserts a personal injury or wrongful death claim caused by the Defect.

115. **Numerosity—FRCP 23(a)(1)**. The Ford F-150 is "the nation's No. 1 selling pickup truck, as well as the country's largest-selling vehicle overall. Last year, Ford sold 726,004 F-150s…. Ford ballyhooed that its 'F-Series achieves best-selling truck for the 45th straight year and best-selling vehicle in American for the 40th year in a row.'"[16] Ford's Form 10-K filed with the SEC for the fiscal year ending 2016 likewise boasts that the "F-Series has been the U.S. truck leader for 40 years."[17]

---

[16] https://www.bizjournals.com/cleveland/news/2022/01/05/fords-f-150-remains-the-us-pickup-truck-king.html (Jan 5, 2022).

[17] Ford Motor Co. Form 10-K (Feb. 9, 2017) at 29.

116.  Defendant's net income attributable solely to Ford Motor Company for the period 2012-2016 exceeded $27 billion.[18]

117.  From 2014-2016 (within the Class period of 2011-2016 for F-150s), Defendant sold an estimated 2.35 million F-Series trucks.[19]

118.  As of December 31, 2016 (during the Class period), Ford had more than 10,000 dealerships nationwide.[20]

119.  The National Class and California Subclass are comprised of a sufficiently large group of individuals—believed to be in the hundreds of thousands—and thus is so large that it is impracticable to join all members of either the National Class or the California Subclass before the Court as individual plaintiffs.

120.  **Typicality—FRCP 23(a)(3).** Plaintiffs are members of the National Class and California Subclass, and bring claims typical of the National Class and California Subclass (which are typical of one another as well), because Plaintiffs—like all other Class members—purchased or leased a Class Vehicle designed, manufactured, marketed, distributed, sold, and/or leased by Ford. Each received less than the full value of the Class Vehicles due to the Defect and Ford's uniform omissions and concealment of the Defect. Class members, as ordinary reasonable consumers like Plaintiffs, would not have purchased the Class Vehicles or paid as much to own or lease them had Ford not concealed the Defect, which was unknown to Plaintiffs and the Class alike.

121.  Consequently, Plaintiffs and the Class have all been damaged by Ford's pattern of misconduct—which is common to all Class members—and have suffered

---

[18] *Id.* at 24.

[19] https://fordauthority.com/fmc/ford-motor-company-sales-numbers/ford-sales-numbers/ford-f-series-sales-numbers/. The F-Series includes F-250, F-350 and F-450 trucks, but the F-150 has the largest proportion of sales.

[20] Ford Motor Co. Form 10-K (Feb. 9, 2017) at 2.

the same economic harms. In other words, Ford's misconduct is common to all Class members and constitutes a shared factual nexus of injury to the Class.

122. Plaintiffs and the Class were exposed to the same or substantially similar misrepresentations regarding the safety and merchantability of the Class Vehicles; as ordinary consumers, all shared reasonable and foreseeable expectations regarding the safety and merchantability of the Class Vehicles; and all were harmed by the same omissions—namely, Defendant's concealment of the Defect.

123. Plaintiffs and each Class member suffered economic damages that are calculable on a class-wide basis. The claims all arise from a single course of conduct and each Class member would therefore individually bring substantively identical legal and factual arguments to establish Ford's liability for its misconduct.

124. There are no defenses available that are unique to either Plaintiff.

125. **Commonality & Predominance—FRCP 23(a)(2) & 23(b)(3).** The Class is united by a community of interest in obtaining appropriate remedies, including injunctive relief, repair or replacement of the defective vehicles, restitution, damages, and other available relief designed to redress Ford's wrongful conduct. This action involves questions of law and fact that are common to the Class that are susceptible to common answers and that predominate over any individual questions specific to any Class members. These include:

    a. whether the Class Vehicles have defective exhaust manifolds;

    b. whether the Defect constitutes a material fact to an ordinary reasonable consumer;

    c. whether an ordinary reasonable consumer would have purchased or leased a Class Vehicle had the Defect been disclosed;

    d. whether an ordinary reasonable consumer would have paid less money to purchase or lease a Class Vehicle had they known of the Defect—and if so, how much less they would have paid;

e.  whether the Class Vehicles commanded a premium relative to their actual value in light of the undisclosed Defect;

f.  whether and when Ford had actual or constructive knowledge of the Defect;

g.  whether Ford had a duty to disclose the Defect to the Class and whether it fraudulently concealed the Defect;

h.  whether Ford had and has a continuing duty to disclose the Defect to the Class;

i.  whether Ford breached any or all applicable warranties with respect to the Class Vehicles;

j.  whether Ford breached other duties or violated other applicable laws by its misrepresentations and/or by its omissions, including its concealment of the Defect

k.  whether Ford breached its obligations to provide timely repairs for the Class Vehicles;

l.  whether and to what extent Ford is liable for diminution in value, out-of-pocket expenses, and other losses incurred by the Class as a result of the Defect;

m.  the amount of damages, restitution, or other monetary relief to which the Class is entitled;

n.  whether Ford should be declared legally and financially responsible for notifying the Class of the Defect;

o.  whether Ford should be declared legally and financially responsible for notifying Class Members of their right to whatever relief to which the Class is entitled;

p.  whether and to what extent Ford is obligated to pay actual and consequential damages to the Class as a result of the Defect and Ford's associate misconduct;

q. whether and to what extent other equitable or injunctive relief is appropriate to remedy the harms caused by Ford's misconduct and to prevent further such harms; and

r. whether and to what extent Ford should be obligated to pay punitive damages as a result of its misconduct.

126. These common issues will drive the resolution of the litigation in that their determination will resolve in one stroke issues that are central to the validity of each Class member's claims.

127. The factual and legal issues identified above

a. remain common to the Class;

b. arise from a common course of conduct and systemic policy decisions made by Defendant;

c. predominate in number and importance over questions that may not be common to the class; and

d. preclude neither class-wide calculation of damages nor the methodological determination of how such damages should be allocated among Class members.

128. **Adequacy of Representation—FRCP 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Class members. Plaintiffs commit to protecting the interests of the Class without exercising personal interest or otherwise acting in a manner inconsistent with the best interests of the Class generally.

129. Plaintiffs have retained attorneys with exceptional experience in complex litigation, including extensive class action experience and experience in handling consumer protection cases and product liability cases, including automobile defect claims. The firms and lead counsel for the firms retained by Plaintiffs also have substantial trial experience, individually and collectively. Plaintiffs and their

attorneys will responsibly, ethically, and vigorously advocate on behalf of the Class and Plaintiffs' counsel have ample resources to do so.

130. **Ascertainability.** The identities of Class members are readily ascertainable from various sources including Defendant's production, distribution, Polk automotive data, ownership records, government ownership records, or via simple notice by publication.

131. **Superiority.** This class action is superior to the other means available to the class and subclass to obtain relief because:

    a. the damages suffered by individual Class members are relatively small compared to the burden and expense of individual litigation of the claims described here against Defendant so that making the class whole in the absence of a class action is unlikely and impracticable;

    b. Class members accordingly have relatively less interest in individually controlling the prosecution of separate actions (if they even are aware of the issue, which most likely are not given the nature of the Defect and its concealment); and it cannot be said that the interests of individuals pursuing individual cases in conducting separate lawsuits is so strong as to call for denial of a class action;

    c. denial of class treatment runs the risk of establishing incompatible standards of conduct for Defendant, discouraging the prosecution of meritorious but relatively small claims, and it may result in adjudications which would be dispositive of the interests of other Class members who are not parties to the adjudication, or otherwise substantially impair the ability of Class members (and Defendant) to protect their rights and interests;

    d. Defendant has no facially plausible interest in defending against separate, geographically dispersed claims and, in fact, that would be

more burdensome to Defendant than defending against all potential claims in a single forum and proceeding;

    e.  likewise, the judicial system has no interest in burdening a number of courts when the claims of a cohesive Class can be fairly and efficiently concentrated and managed by this Court;

    f.  the claims are indeed manageable because the claims are governed by one state's law or by the laws of more than one state that are consonant with one another; and

    g.  the class procedure is designed to result in the fair, uniform, and efficient adjudication of the sorts of claims presented by this Complaint.

132. Ford's misconduct impacts all Class members, whose losses are capable of calculation on a Class-wide basis.

133. **Injunctive and Declaratory Relief—FRCP 23(b)(2).** Ford acted or refused to act on grounds generally applicable to the Class, making the award of equitable relief and/or restitution appropriate to the National Class and California Subclass in their entirety.

134. **Particular Issues—FRCP 23(c)(4).** Any or all of the issues identified in ¶ 125 are appropriate for certification pursuant to Rule 23(c)(4) because each is particular and common to the Class and the resolution of each or any number of them would materially advance the disposition of this action and the parties' interests.

135. Certification of particular issues would move the litigation forward efficiently and would save money, time, and judicial resources for all involved, regardless of whether the action as a whole might be certified.

//

//

//

//

//

# VI. <u>CAUSES OF ACTION</u>

## COUNT 1
## Common Law Fraudulent Concealment
(On Behalf of the National Class & the California Subclass)

136. Plaintiffs re-allege and incorporate the factual allegations in preceding paragraphs.

137. Plaintiffs bring this count against Ford on behalf of themselves, the National Class and the California Subclass (referred to collectively as "the Class") for fraudulent concealment based on the particular misconduct alleged throughout this Complaint and elaborated upon below.

138. The state laws involved do not conflict with one another in a case-dispositive manner and they involve the same key elements: a duty to disclose a material fact, intentional concealment, and resulting damage.

139. **Duty.** Ford had and continues to have a duty to disclose the existence, nature, and extent of the Defect because:

    a. the safe and reliable operation and functionality of the Class Vehicles' exhaust systems, including the exhaust manifolds, are central to the safe and reliable function of the Class Vehicles as a whole;

    b. Ford was in a superior position to know that the Defect existed as the designer, manufacturer, assembler, distributor, marketer, and warrantor of the Class Vehicles and Ford remains in that position as to the vast majority of unwitting Class members;

    c. as Ford knew, Plaintiffs and the Class lacked access to Ford's proprietary and other non-public information, while information in the public domain was insufficient to alert a reasonably diligent consumer to the existence of the Defect, thus preventing Plaintiffs and the Class from knowing about the existence of the Defect or its manifestations during operation of the Class Vehicles;

d. Plaintiffs and the Class were not involved in the design or manufacture of the Class Vehicles, and as such could not be expected to learn or know about the existence and cause of the Exhaust Manifold Defect;

e. Ford knew that Plaintiffs and the Class lacked access to the design and manufacturing materials necessary to understand the existence and cause of the Defect;

f. Ford knew that ordinary reasonable consumers would expect the Class Vehicles to be free of significant defects central to the function of the vehicles such that the Defect would constitute a material fact in any purchasing or leasing decision, i.e., it would have influence any and every reasonable consumer's purchasing or leasing decision, including whether and how much to pay to purchase or lease a vehicle; and

g. Ford's public pronouncements and its representations in marketing and labeling the Class Vehicles were uniformly positive and consistent in terms of theme and content, thus giving rise to a duty to tell the whole truth about the Class Vehicles.

140. **Concealment.** Ford concealed the Defect by:

a. falsely representing that the Class Vehicles—including its component parts, which include the exhaust manifolds—were safe, merchantable, and fit for their intended use;

b. knowingly selling and profiting from vehicles equipped with defective exhaust manifolds while remaining silent as to Defect with the intent and purpose of ensuring that prospective customers would remain unaware of the Defect and would purchase or lease the Class Vehicles without consideration of how the Defect affected the value of the Class Vehicles;

c. purposefully withholding the existence of the Defect from dealerships, retailers, service facilities, and other businesses that sell, inspect,

service, and maintain vehicles so that the public would remain ignorant of the Defect and continue to purchase the Class Vehicles;

d.  failing to recall the Class Vehicles or to otherwise alert the public to the existence, nature, and extent of the Defect; and

e.  misrepresenting and failing to disclose the cause of various manifestations of the Defect when consumers experienced such problems, as alleged above while also misrepresenting the cause of exhaust manifold failures in the Class Vehicles when responding to warranty claims and questions from consumers, dealers, and service facilities.

141.  **Causation.** Ford's deceptive, misleading, unfair, unconscionable, and fraudulent acts and practices have directly and foreseeably caused damages to Plaintiffs and the Class, as alleged in Section III.D and elsewhere in this Complaint. In particular:

a.  Ford's intentional concealment of the Defect and Ford's false, deceptive, misleading, and confusing representations and omissions would influence any ordinary, average, and reasonable consumer's decision whether to buy or purchase a Class Vehicle, given that the Defect pertains to the safe and reliable operation of the Class Vehicles. No reasonable consumer, including Plaintiffs, would have purchased or leased a Class Vehicle but for Ford's acts, practices, omissions, and active concealment of the Defect, as described throughout this Complaint;

b.  any ordinary and objectively reasonable consumer acting reasonably in the circumstances would have been deceived by Ford's acts and practices, including its concealment of the Defect;

c.  as a direct, foreseeable, and proximate result of Ford's deceptive practices, Plaintiffs and the Class have sustained economic injury at the

time of purchase or lease as well as other economic losses alleged above.

142.  Accordingly, Plaintiffs and the Class demand all available relief including all available compensatory and/or liquidated damages in an amount no less than the difference in value between what Plaintiffs and the Class reasonably believed they were paying for and the value of the vehicle they actually received; attorney's fees and costs; all available equitable, restitutionary, and injunctive relief; and other relief sought in the Prayer for Relief below or that is otherwise available and appropriate.

143.  Additionally, Ford's intentional acts of deceit were carried out deliberately, maliciously, and wantonly, knowing full well—and therefore intending—that its deceit would cause economic harm to Plaintiffs and the Class for its own aggrandizement. Ford knew that its misconduct, including its concealment of the Defect, posed a safety risk to Plaintiffs and the Class; but it carried out its fraudulent scheme because doing so not only saved it money, but increased its profits and its market share. Ford's reprehensible conduct thus warrants the imposition of punitive damages to punish it and to deter it and others from engaging in the same or similar schemes in the future.

## COUNT 2
### Violation of California's Consumer Legal Remedies Act (CLRA)
(On Behalf of the California Subclass)

144.  Plaintiffs re-allege and incorporate the factual allegations in preceding paragraphs.

145.  Plaintiffs bring this count against Ford on behalf of themselves and the California Subclass for violation of the CLRA (Cal. Civ. Code §§ 1750, *et seq.*) (CLRA).

146.  Defendant is a "person" as defined in California Civil Code § 1761(c).

147. Plaintiffs and the California Subclass are "consumers" as defined in California Civil Code § 1761(d) because they purchased Class Vehicles primarily for personal, family, or household use.

148. The purchase of the Class Vehicles by Plaintiffs and the California Subclass constitute "transactions" within the meaning of California Civil Code § 1761(e).

149. The Class Vehicles are "goods" as defined in California Civil Code § 1761(a).

150. Ford's violations of the CLRA occurred repeatedly in their trade or practice—including the design, manufacture, distribution, marketing, sale, and lease of the Class Vehicles.

151. Ford violated California Civil Code § 1770(a) by concealing, misrepresenting, and failing to disclose the Defect, including the true nature, extent, and cause of the Defect; the risks to safety and reliability that it posed; and the ways in which the Defect manifested during normal and intended operation of the Class Vehicles. In particular, Ford violated:

a. § 1770(a)(5) by representing that the Class Vehicles had a characteristic that they did not actually have—i.e., that the vehicles were safe and suitable for use normal and intended use on the roadways, when in fact they were not because of the latent Defect;

b. § 1770(a)(7) by representing that the Class Vehicles were of a particular quality, grade, or standard when, in fact, they were not of that quality, grade, or standard;

c. § 1770(a)(9) by concealing and failing to disclose that the Class Vehicles' exhaust manifolds were inherently defective, defectively designed, and not suitable for their intended use despite advertising them as safe and suitable for their intended function; and

d. § 1770(a)(16) by failing to market, distribute, sell, and lease the vehicles in accordance with Ford's previous representations—i.e., that the vehicles were safe, reliable ("Ford Tough"), and suitable for normal and intended use on the roadways, when in fact they were not because of the Defect.

152. Ford had a duty to disclose the Defect because:

   a. the safe and reliable operation and functionality of the Class Vehicles' exhaust systems, including the exhaust manifolds, are central to the safe and reliable function of the Class Vehicles as a whole;

   b. Ford was in a superior position to know that the Defect existed as the designer, manufacturer, assembler, distributor, marketer, and warrantor of the Class Vehicles and Ford remains in that position as to the vast majority of unwitting Class members;

   c. as Ford knew, Plaintiffs and the California Subclass lacked access to Ford's proprietary and other non-public information, while information in the public domain was insufficient to alert a reasonably diligent consumer to the existence of the Defect, thus preventing Plaintiffs and the California Subclass from knowing about the existence of the Defect or its manifestations during operation of the Class Vehicles;

   d. Plaintiffs and the California Subclass were not involved in the design or manufacture of the Class Vehicles, and as such could not be expected to learn or know about the existence and cause of the Exhaust Manifold Defect;

   e. Ford knew that Plaintiffs and the California Subclass lacked access to the design and manufacturing materials necessary to understand the existence and cause of the Defect;

   f. Ford knew that ordinary reasonable consumers would expect the Class Vehicles to be free of significant defects central to the function of the

vehicles such that the Defect would constitute a material fact in any purchasing or leasing decision, i.e., it would have influence any and every reasonable consumer's purchasing or leasing decision, including whether and how much to pay to purchase or lease a vehicle; and

g. Ford's public pronouncements and its representations in marketing and labeling the Class Vehicles were uniformly positive and consistent in terms of theme and content, thus giving rise to a duty to tell the whole truth about the Class Vehicles.

153. Ordinary reasonable consumers have no general appreciation of the components and subcomponents of vehicles and vehicle exhaust systems, but would expect the vehicle to be well-designed and to offer a reasonable level of safety and reliability when used as intended.

154. Every ordinary and objectively reasonable consumer would expect the Class Vehicles to be free of significant defects central to the function of the vehicles and thus implicitly and necessary would hold such an expectation as to the exhaust system and its component parts, including the exhaust manifold.

155. The safe, reliable, and proper functioning of the exhaust manifold is a material component of an automobile transaction because it is required to ensure that the vehicle can safely and reliably operate on the roadways. Accordingly, every ordinary and objectively reasonable consumer would have considered the Defect to constitute an important and material fact in that would have substantially influenced the decision whether to purchase or lease a Class Vehicle and how much to pay, if anything.

156. Every ordinary and objectively reasonable consumer acting reasonably in the circumstances would have been deceived by Ford's misconduct, including its concealment of the Defect.

157. As a direct, foreseeable, and proximate result of Ford's deceptive practices, Plaintiffs and every member of the Class:

a. purchased or leased a vehicle they otherwise would not have purchased or leased or paid more than they otherwise would have;

b. thereby suffered an ascertainable loss of money, property, and value of the Class Vehicles; and

c. suffered actual damages and other economic harms because of the latent Defect, including the losses described in Section III.D and elsewhere in this Complaint.

158.   Due to Ford's original and continuing misconduct alleged throughout this Complaint, Plaintiffs and the California Subclass are entitled, pursuant to California Civil Code § 1780, to injunctive, declaratory, and equitable relief, including an order, judgment, and other judicial action, decision, or proclamation:

a. declaring that the Class Vehicles' exhaust manifolds are defective;

b. declaring that Ford's conduct violated the CLRA;

c. declaring that Plaintiffs and the Class are entitled to reimbursement or restitution for money spent on the Class Vehicles; and

d. enjoining Ford from continuing to violate the CLRA.

159.   Plaintiffs, through counsel, have sent notice to Ford pursuant to Cal. Civ. Code § 1782(a), but the 30-day response period has not elapsed. Thus, Plaintiffs claim no damages pursuant to this Count, but intend to amend this Complaint at the appropriate time to do so.

160.   Specifically, if Defendant fails to respond to Plaintiffs' letter, fails to agree to rectify the problems associated with the actions detailed above, or fails to give notice to all affected consumers within 30 days of the date of written notice, Plaintiffs reserve the right to amend the Complaint to pursue claims for actual, punitive, and statutory damages, as appropriate against Defendant. As to this cause of action, at this time, Plaintiffs seek only injunctive or other equitable relief as described above.

161.   Attached hereto as **Exhibit A** are the venue affidavits of Plaintiffs pursuant to California Civil Code § 1780(d).

162. In prosecuting this action to enforce important rights affecting the public interest, Plaintiffs seek the recovery of attorneys' fees, which are made available to a prevailing plaintiff in class actions such as this.

163. Accordingly, Plaintiffs, individually and on behalf of the California Subclass, seek all available equitable, restitutionary, and injunctive relief; attorney's fees and costs; and other relief sought in the Prayer for Relief below, excepting damages, or that is otherwise available and appropriate.

## COUNT 3
### Violation of California's Unfair Competition Law (UCL)
(On Behalf of the California Subclass)

164. Plaintiffs re-allege and incorporate the factual allegations in preceding paragraphs.

165. Plaintiffs bring this count against Ford on behalf of themselves and the California Subclass for violation of the California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (UCL).

166. The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading."

167. The UCL imposes strict liability. Plaintiffs need not prove that Ford intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—only that such practices occurred.

168. Defendant's acts, omissions, misrepresentations, practices, and non-disclosures alleged throughout this Complaint constitute business acts and practices.

169. Defendant's acts, omissions, misrepresentations, practices and non-disclosures alleged throughout this Complaint constitute unlawful, unfair, and fraudulent business acts and practices because they have the capacity to deceive reasonable consumers, including Plaintiffs and the California Subclass, as to the

benefits and effectiveness of the Class Vehicles and, thereby, the defective exhaust manifolds.

170. Ford had a duty to disclose the Defect based on its superior knowledge as the designer, manufacturer, seller, marketer, and warrantor of the Class Vehicles, and as further alleged in this Complaint.

171. Ford violated Cal. Bus. & Prof. Code § 17200 by engaging in "unfair competition," including through "unlawful, unfair, or fraudulent business acts or practices" and "unfair, deceptive, untrue, or misleading advertising." Ford's violations include:

    a.  advertising, marketing, distributing, selling, and leasing the Class Vehicles when Ford knew those vehicles were defective and unable to reliably and safely perform their intended used;

    b.  failing to disclose the true nature, scope, and extent of the Defect; and

    c.  concealing material facts regarding the Class Vehicles—i.e., that their exhaust manifolds were defective and unable to reliably and safely perform their intended use.

172. Ford's misconduct is "unlawful" under the UCL because it violates:

    a.  California's common law prohibition against fraudulent concealment, as alleged in Count 1;

    b.  the CLRA, as alleged in Count 2;

    c.  the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), 49 U.S.C. 30101, *et seq.*, by failing to timely inform NHTSA of the nature, extent, and scope of the Exhaust Manifold Defect and by allowing the Class Vehicles to continue to be sold, leased, and used in a dangerous and defective condition;

    d.  the implied and express warranty provisions of Cal. Comm. Code § 2313, as alleged in Counts 4 and 6; and

1       e. the Song-Beverly Act, as alleged in Counts 5 and 7.

2       173. Ford's acts and omissions constitute "unfair" business practices under the

3 UCL because:

4          a. Ford engaged in a misleading and deceptive practice of knowingly or

5             intentionally selling the Class Vehicles, all of which are equipped with

6             defective exhaust manifolds;

7          b. Ford's acts and omissions offend an established public policy of

8             transparency in the sale or lease of consumer vehicles, and it engaged in

9             immoral, unethical, oppressive, and unscrupulous activities that are

10             substantially injurious to consumers; and

11          c. the harm to Plaintiffs and the California Subclass grossly outweighs the

12             utility of Defendant's practices.

13       174. Ford's deceptive practices constitute fraudulent business acts or practices

14 because they deceived Plaintiffs and are highly likely to deceive members of the

15 consuming public into purchasing a Class Vehicle that, unbeknownst to Plaintiffs and

16 the California Subclass, were dangerously defective and unsuitable for their intended

17 purpose.

18       175. Ford has engaged in deceptive, misleading, unfair, unconscionable, and

19 fraudulent acts and practices that have caused actual damages to Plaintiffs and the

20 California Subclass members, as described herein.

21       176. Ford's intentional concealment of the Defect and its false, deceptive,

22 misleading, and confusing representations and omissions would be material to any

23 ordinary, average, and objectively reasonable consumer's decision whether to buy or

24 lease a Class Vehicle, given that the Defect is central to the vehicles' functionality

25 and it pertains to the safe and reliable operation of the Class Vehicles. No reasonable

26 consumer, including Plaintiffs, would have purchased or leased a Class Vehicle but

27 for Ford's acts, practices, omissions, and active concealment of the Defect.

28

---

177. Any ordinary, average, objectively reasonable consumer acting reasonably in the circumstances would have been deceived by Defendant's acts and practices, including the misrepresentations and omissions described herein.

178. As a direct, foreseeable, and proximate result of Ford's deceptive practices, Plaintiffs and every member of the California Subclass:

  a. purchased or leased a vehicle they otherwise would not have purchased or leased or paid more than they otherwise would have;

  b. thereby suffered an ascertainable loss of money, property, and value of the Class Vehicles; and

  c. suffered actual damages and other economic harms because of the latent Defect, including the losses described in Section III.D and elsewhere in this Complaint.

179. Due to Ford's original and continuing misconduct alleged throughout this Complaint, Plaintiffs and the California Subclass are entitled to injunctive, declaratory, and equitable relief, including an order, judgment, and other judicial action, decision, or proclamation:

  a. declaring that the Class Vehicles' exhaust manifolds are defective;

  b. declaring that Ford's conduct violated the UCL;

  c. declaring that Plaintiffs and the California Subclass are entitled to reimbursement or restitution for money spent on the Class Vehicles; and

  d. enjoining Ford from continuing to violate the UCL and, in accordance with Bus. & Prof. Code § 17203, enjoining Ford to commence a corrective advertising campaign.

180. Accordingly, Plaintiffs and the California Subclass demand all available relief including attorney's fees and costs; all available equitable, restitutionary, and injunctive relief; and other relief sought in the Prayer for Relief below or that is otherwise available and appropriate.

181.  Plaintiffs allege, in the alternative to their other causes of action, that they lack an adequate remedy at law because monetary damages alone fail to make the Class Vehicles safe for continued operation. To do so, Plaintiffs require that their exhaust manifolds be replaced with a safer design—and the cost of replacing the exhaust manifolds, including parts and labor, potentially exceeds the amount of monetary damages suffered as a result of the diminution in value.

## COUNT 4
## Breach of Implied Warranty
(On Behalf of the California Subclass)

182.  Plaintiffs re-allege and incorporate the factual allegations in preceding paragraphs.

183.  Plaintiffs bring this count individually and on behalf of the California Subclass for breach of implied warranty.

184.  The Class Vehicles are "goods" as defined in Cal. Com. Code §§ 2105(1) and 10103(a)(8).

185.  The California Subclass members are "buyers" and "lessees" of the Class Vehicles as defined in Cal. Com. Code §§ 2103(1)(a) and 10103(a)(14).

186.  Ford is a "merchant," "seller," and "lessor" as define in Cal. Com. Code §§ 2104(1), 10103(c), and 10103(a)(16).

187.  California law conferred an implied warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which they were to be used pursuant to Cal. Com. Code §§ 2314 and 10212.

188.  The Class Vehicles are not merchantable, and as such Defendant breached its implied warranty, because:

    a.  the Class Vehicles do not have the quality that a buyer would reasonably expect due to being equipped with defective exhaust manifolds;

b. the Class Vehicles would not pass without objection in the automotive trade given the Defect;

c. the Defect renders the Class Vehicles unsafe to drive and unfit for ordinary purposes;

d. the labeling for the Class Vehicles failed to disclose the Defect; and

e. the Class Vehicles do not conform to their labeling, which represents that the vehicles are safe and suitable for their intended use.

189. Ford's breach of its implied warranties proximately caused Plaintiffs and the California Subclass, collectively, to suffer damages of more than $5,000,000.00.

190. Accordingly, Plaintiffs, individually and on behalf of the California Subclass, seek all available monetary damages (including compensatory and/or liquidated damages and punitive damages) in an amount no less than the difference in value between what Plaintiffs and the California Subclass reasonably believed they were paying for and the value of the vehicle they actually received; attorney's fees and costs; all available equitable, restitutionary, and injunctive relief; and all other relief sought in the Prayer for Relief below or that is otherwise available and appropriate.

## COUNT 5
**Violations of the Song-Beverly Act via Breach of Implied Warranty**
(On Behalf of the California Subclass)

191. Plaintiffs re-allege and incorporate the factual allegations in preceding paragraphs.

192. Plaintiffs bring this count against Ford individually and on behalf of the California Subclass for Violations of the Song-Beverly Act.

193. California Civil Code § 1792 provides that, unless properly disclaimed, every sale of consumer goods is accompanied by an implied warranty of merchantability. Defendant did not at any time properly disclaim the warranty.

194. The Class Vehicles are "consumer goods" as defined in California Civil Code § 1791(a).

195. Plaintiffs and the California Subclass are "buyers" as defined in California Civil Code § 1791(b).

196. Ford is the "manufacturer" of the Class Vehicles and defective exhaust manifolds under California Civil Code § 1791(j).

197. Ford knew of the particular purposes for which the Class Vehicles equipped with defective exhaust manifolds were intended and impliedly warranted to Plaintiffs and the California Subclass that the Class Vehicles were "merchantable" under California Civil Code §§ 1791.1(a) & 1792.

198. The Class Vehicles are not merchantable, and as such Ford breached its implied warranty, because:

    a. the Class Vehicles do not have the quality that a buyer would reasonably expect due to the Defect;

    b. the Class Vehicles would not pass without objection in the automotive trade because they are equipped with defective exhaust Manifolds;

    c. the Defect renders the vehicles unsafe to drive and unfit for ordinary purposes;

    d. the labeling for the Class Vehicles failed to disclose the Exhaust Manifold Defect; and

    e. the Class Vehicles do not conform to their labeling, which represents that the vehicles are safe and suitable for their intended use.

199. Plaintiffs and the California Subclass received the Class Vehicles in a condition that substantially diminishes their value, and that prevents the vehicles from safely and properly functioning. As a result of Defendant's failure to comply with their statutory obligations, Plaintiffs are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their vehicles, or the overpayment or diminution in value of their vehicles.

200. Ford's breach of its implied warranties proximately caused Plaintiffs and the Class, collectively, to suffer damages of more than $5,000,000.00

201. Accordingly, Plaintiffs, individually and on behalf of the California Subclass, seek all available monetary damages (including compensatory and/or liquidated damages and punitive damages); attorney's fees and costs; all available equitable, restitutionary, and injunctive relief; and all other relief sought in the Prayer for Relief below or that is otherwise available and appropriate.

## COUNT 6
### Breach of Express Warranty
(On Behalf of the California Subclass)

202. Plaintiffs re-allege and incorporate the factual allegations in preceding paragraphs.

203. Plaintiffs bring this count against Ford individually and on behalf of the California Subclass for breach of express warranty.

204. The Class Vehicles are "goods" as defined in Cal. Com. Code §§ 2105(1) and 10103(a)(8).

205. Ford is a "merchant," "seller," and "lessor" of the Class Vehicles under Cal. Com. Code §§ 2104(1), 10103(c), and 2103(1)(d), respectively.

206. Plaintiffs and the California Subclass are "buyers" and "lessees" as defined in Cal. Com. Code §§ 2103(1)(a), 10103(a)(14).

207. Ford issued an express written warranty for each Class Vehicle it sold or leased, including that

    a.  the exhaust manifolds would be free of defects in materials and workmanship at the time of sale; and

    b.  each Class Vehicle would be free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized service facilities, without charge, to fully correct defects in materials or workmanship.

208. These warranties formed the basis of the bargain with regard to Plaintiffs' and the California Subclass members' purchase and lease of Class Vehicles.

209. Ford breached these warranties because:

    a. the Class Vehicles have latent defective exhaust manifolds that pose an unreasonable risk of manifesting and that in fact manifest in ways that pose a constant risk to safety and compromise reliability;

    b. Ford denied and concealed the existence of the Defect; and

    c. Ford has refused and failed to provide the needed repairs and replacements to address and correct the Defect.

210. Defendant's breach of its express warranties proximately caused the Plaintiffs and California Subclass members (collectively) to suffer damages in excess of $5,000,000.00.

211. Accordingly, Plaintiffs, individually and on behalf of the California Subclass, seek all available monetary damages (including compensatory and/or liquidated damages and punitive damages); attorney's fees and costs; all available equitable, restitutionary, and injunctive relief; and all other relief sought in the Prayer for Relief below or that is otherwise available and appropriate.

**COUNT 7**
**Violations of the Song-Beverly Act via Breach of Express Warranty**
(On Behalf of the California Subclass)

212. Plaintiffs re-allege and incorporate the factual allegations in preceding paragraphs.

213. Plaintiffs bring this count against Ford individually and on behalf of the California Subclass (referred to as "the California Subclass") for Violations of the Song-Beverly Act.

214. The Class Vehicles are "consumer goods" as defined in California Civil Code § 1791(a).

215.  Plaintiffs and the California Subclass are "buyers" as defined in California Civil Code § 1791(b).

216.  Ford is the "manufacturer" of the Class Vehicles under California Civil Code § 1791(j).

217.  Ford issued an express written warranty for each defective Class Vehicle it sold, including that:

    a.   the Exhaust Manifold Defect would be free of defects in materials and workmanship at the time of sale; and

    b.   the vehicle would be free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized service facilities, without charge, to fully correct defects in materials or workmanship.

218.  These warranties formed the basis of the bargain with regard to the California Subclass members' purchase and lease of Class Vehicles.

219.  Ford breached these warranties because:

    a.   the Class Vehicles have latent defective exhaust manifolds that pose an unreasonable risk of manifesting and that in fact manifest in ways that pose a constant risk to safety and compromise reliability;

    b.   Ford denied and concealed the existence of the Defect;

    c.   Ford has refused and failed to provide the needed repairs and replacements to address and correct the Defect.

220.  Plaintiffs and the California Subclass received the vehicles in a condition that substantially diminishes their value, and which prevents the vehicles from safely and properly functioning. As a result, Plaintiffs are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their vehicles, or the overpayment or diminution in value of their vehicles.

221.  Ford's breach of its express warranties proximately caused Plaintiffs and the Class, collectively, to suffer damages of more than $5,000,000.00.

222. Accordingly, Plaintiffs, individually and on behalf of the California Subclass, seek all available monetary damages (including compensatory and/or liquidated damages and punitive damages); attorney's fees and costs; all available equitable, restitutionary, and injunctive relief; and all other relief sought in the Prayer for Relief below or that is otherwise available and appropriate.

## VII.  **PRAYER FOR RELIEF**

223. Plaintiffs pray that judgment be entered against Defendant as follows:

a.  that this action be certified as a class action;

b.  that Plaintiffs be appointed as the representatives of the National Class and California Subclass;

c.  that Plaintiffs' attorneys listed below be appointed Class Counsel;

d.  for an order declaring Defendant's conduct to be unlawful;

e.  for an order compelling Defendant to make restitution to Plaintiffs, the Class and Subclass members in an amount to be proven at trial;

f.  or actual, compensatory, statutory and/or liquidated damages;

g.  for punitive damages;

h.  for pre- and post-judgment interest at the legal rate;

i.  for injunctive and other equitable relief as alleged herein and as necessary to protect the interests of Plaintiffs, and members of the Class and Subclass, and to prohibit Defendant from engaging in the unlawful, unfair, deceptive and fraudulent acts described above;

j.  for an order that Defendant engage in a corrective advertising campaign;

k.  for an order of restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs and the members of the Class and Subclass as a result of its unlawful, unfair, and fraudulent business practices;

l.  for cy pres/fluid recovery, as may be appropriate;

m. for costs of this action and out-of-pocket expenses;

n. for attorneys' fees, pursuant to, *inter alia*, the common fund doctrine; and

o. for such other and further relief that the Court deems available and proper.

## JURY DEMAND

224. Plaintiffs, on behalf of themselves, the National Class, and the California Subclass, hereby demand a trial jury of all issues triable by right.

Dated: June 1, 2022

**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808

**KAZEROUNI LAW GROUP, APC**
Jason A. Ibey, Esq. (SBN: 284607)
jason@kazlg.com
321 N. Mall Drive, Suite R108
St. George, Utah 84790
Telephone: (800) 400-6808

**NEWSOME & MELTON**
R. Frank Melton, II (PHV forthcoming)
melton@newsomelaw.com
William C. Ourand, Jr. (PHV forthcoming)
201 S. Orange Ave., Suite 1500
Orlando, FL 32801
ourand@newsomelaw.com
Tel: (407) 289-1433

**LEVIN PAPANTONIO RAFFERTY**
William F. Cash (PHV forthcoming)
bcash@levinlaw.com
Scott Warrick (PHV forthcoming)
swarrick@levinlaw.com
316 S. Baylen St., Suite 600
Pensacola, FL 32502
Tel: (850) 435-7140

**THE DAVENPORT LAW FIRM, LLC**
Courtney L. Davenport (PHV forthcoming)
courtney@thedavenportlawfirm.com
18805 Porterfield Way
Germantown, MD 20874
Tel: (703) 901-1660

*Counsel for Plaintiffs & the Proposed*
*National Class & California Subclass*

# Exhibit A

# DECLARATION OF RICARDO FRANCO

**I, RICARDO FRANCO, DECLARE:**

1. On or about April 13, 2013, I purchased a new 2013 Ford F-150 (the "Product") through Citrus Motors Ontario, Inc. located in Ontario, California.

2. At the time of my purchase and review of the Product, I was in the County of San Bernardino, California, where I also currently reside.

3. Also, it is my understanding that Defendant, Ford Motor Company, does business in the County of San Bernardino, State of California.

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct, and that this declaration was executed on _____06/01/2022_____, 2022.

By:_____

RICARDO FRANCO

## DECLARATION OF WILLIAM KIEFER

**I, WILLIAM KIEFER, DECLARE:**

1. On or about September 3, 2016, I purchased a new 2016 Ford F-150 (the "Product") through a Sunrise Ford dealership located in Fontana, California.

2. At the time of my purchase and review of the Product, I was in the County of San Bernardino, State of California, where I also currently reside.

3. Also, it is my understanding that Defendant, Ford Motor Company, does business in the County of San Bernardino, State of California.

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct, and that this declaration was executed on _____06/01/2022_____, 2022.

By:_____*william kiefer*_____

WILLIAM KIEFER